U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

AUG - 9 2018

CLERK, U.S. DISTRICT COURT
By _____
Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA

v.

ROBERT CARL LEONARD, JR.

ORIGINAL

NO. 3-18CR-410-M

## FACTUAL RESUME

In support of Robert Carl Leonard, Jr.'s plea of guilty to the offense in Count One of the Information, Leonard, the defendant, Christopher W. Lewis, the defendant's attorney, and the United States of America (the government) stipulate and agree to the following:

## ELEMENTS OF THE OFFENSE

To prove the offense alleged in Count One of the Information charging a violation of 18 U.S.C. § 1349, that is, conspiracy to commit honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346, the government must prove each of the following elements beyond a reasonable doubt:[1]

First:        That the defendant and at least one other person made an agreement to commit the crime of conspiracy to commit honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346, as charged in the Information;

Second:    That the defendant knew the unlawful purpose of the agreement; and

Third:      That the defendant joined in the agreement willfully, that is, with the

_____

[1] See United States v. Simpson, 741 F.3d 539, 547 (5th Cir. 2014)

Factual Resume—Page 1

intent to further the unlawful purpose.

The elements of honest services wire fraud are as follows:

*First*:      That the defendant knowingly devised or intended to devise any scheme to defraud, as set forth in the Information;

*Second*:      That the scheme to defraud employed false material pretenses or omissions;

*Third*:      That the defendant transmitted or caused to be transmitted by way of wire communications, in interstate commerce, any writing, sign, signal, picture, or sound for the purpose of executing such scheme; and

*Fourth*:      That the defendant acted with a specific intent to defraud.[2]

## STIPULATED FACTS

1.      The defendant agrees that the following facts are true and correct and that his testimony at any trial would reflect the same.

2.      From in or around 2011 to in or around 2017, in the Dallas Division of the Northern District of Texas and elsewhere, the defendant, Leonard, Ricky Dale Sorrells, Person C, Slater Swartwood, Sr., and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate and agree together and with each other to violate Title 18, United States Code, Sections 1343 and 1346.

3.      Leonard, at all relevant times, knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose.

---

[2] Fifth Circuit Pattern Jury Instructions (2015), 2.57.

4.     Leonard was the owner and president of Force Multiplier Solutions (FXS), a technology company that put cameras, including stop-arm cameras, on school buses. In conjunction with legislation making passing a stop-arm camera a fineable offense, FXS's systems were sold to municipalities and other government entities as a revenue generating source. FXS also profited from a percentage of the fine revenue.

5.     Dallas County Schools (DCS) was a government agency that provided busing services to the students of various Texas school districts, including Dallas Independent School District.

6.     Until March 2016, Sorrells served as the superintendent of DCS. As a result of his position, Sorrells was a public servant. As superintendent, Sorrells had authority to enter into contracts on DCS's behalf that exceeded $50,000. He also had the authority over purchasing, including the purchasing of bus-camera equipment from FXS.

7.     During the conspiracy, Leonard paid Sorrells over $3 million in bribes and kickbacks in exchange for Sorrells's decision to enter into contracts and licensing agreements with FXS and to purchase bus-camera equipment.

8.     To disguise the illegal purpose of the payments, Leonard funneled most of the bribe and kickback payments through shell entities controlled by his business associate, Swartwood, including ELF Investments.

9.     Leonard also funneled approximately $800,000 to Sorrells through a law firm and paid over $200,000 toward Sorrells's credit card and student loan debt through a bank account opened in the name of a nonexistent entity.

10.     To further mask the illegal purpose of these payments, the coconspirators originally characterized the payments as "consulting" but later attempted to recast the payments as a loan.  Sorrells provided no legitimate consulting services in exchange for the payments and the "loan" was fake.

11.     Person C served as a Council Member on the Dallas City Council from before the beginning of the conspiracy until June 2015, and upon reelection thereafter in May 2017 to the present.  Person C was a public servant as a result of his/her position.

12.     During the conspiracy, Leonard provided Person C over $450,000 in bribe and kickback payments/benefits[3] in exchange for favorable official action, or the promise of favorable official action, related to FXS's business interests and Leonard's aspirations of developing low income housing in Dallas.

13.     The bribe and kickback payments/benefits took the form of thousands of dollars of personal or FXS checks which Leonard later learned Person C cashed at liquor stores or a pawn shop; approximately $390,000 funneled to Person C through ELF Investments under the guise of real estate consulting; fully funded trips to New Orleans, Austin, and Las Vegas; custom made suits; security cameras for Person C's home; a campaign bus; a fake loan for Person C's father's home; funeral expenses for Person C's father; routine cash payments of approximately $1000 to $2000; tires for Person C's car; casino chips; and gambling money for the horse track.

---

[3] Leonard also directly or indirectly made approximately $45,000 in campaign contributions to Person C during the conspiracy.

14.    Every dollar that Leonard paid Person C was a bribe to secure Person C's support as a Council Member of FXS's stop-arm program and Leonard's real estate plans.

15.    FXS's stop-arm program was not viable absent an ordinance making passing a raised stop-arm camera a fineable offense.

16.    FXS presented the stop-arm program to the City of Dallas.  Contrary to Leonard's proposal, the City Manager recommended that the proposed fine be reduced from $300 to $80, an amount which would have undermined the economic viability of the program.

17.    Person C warned Leonard about the changes to FXS's proposal. Thereafter, Person C told Leonard that he/she supported the stop-arm program and asked Leonard to make a contribution to Person C's spouse's political campaign, which Leonard did.

18.    The contribution was a bribe.  Leonard knew nothing about Person C's spouse's campaign and had no interest in it.  Leonard paid Person C only because he expected Person C's support on the City Council regarding the stop-arm program, and person C was fully aware of this quid pro quo.

19.    On May 23, 2012, Person C voted in favor of an ordinance creating a civil offense and a penalty consistent with Leonard's original proposal for unlawfully passing a stopped school bus with a stop-arm extended.

20.     Days later, Person C told Leonard that he/she had supported the stop-arm program and wanted Leonard's support.  Leonard gave Person C a check for $5,000, with the byline "Loan," which Leonard later learned Person C cashed at a liquor store.

21.     Thereafter, Person C told Leonard that he/she needed more money to live. Leonard began paying Person C bribes and kickbacks through ELF Investments under the guise of a "real estate consultancy," even though Person C did not appear to have any expertise or experience in developing real estate.

22.     Every payment that Person C received from Leonard through ELF Investments was a bribe to secure Person C's continued support of the stop-arm program and influence on the City Council related to Leonard's plans to develop real estate in South Dallas, including powers of eminent domain, the first seat at the table when opportunities arose, government financing, and any and all City Council action that became necessary to forward Leonard's attempts to develop low income housing.

23.     Almost immediately after Person C's "real estate consultancy" was terminated, and the payments had ceased, the coconspirators attempted to recast a substantial portion of the bribe and kickback payments that Person C had already received as a "loan."

24.     During the conspiracy, Person C would ask Leonard for money on a nearly weekly basis; Leonard never offered to make a payment unsolicited.  Person C would make statements like, "I want to gamble but I don't have any money right now," or "I don't have any dough right now," or "my car is broken."  Leonard never turned down Person C's requests for payments.

25.     On those occasions when Leonard would make a payment to Person C by check, Person C would tell him whom to make the check to.

26.     It was clear that Person C was soliciting bribe and kickback payments from Leonard through his/her constant requests for money and other benefits.  Person C would always remind Leonard of what he/she had done for FXS before asking for something.  Person C constantly told Leonard that he/she supported him in anything he did and wanted to help him anyway he/she could, which was a clear reference to the stop-arm program and Leonard's real estate aspirations.  Person C made his/her intent to be influenced clear by telling Leonard things like, "I am the City Council."

27.     Leonard continued to pay bribes and kickbacks to Person C throughout the conspiracy because he expected Person C to remain in office and be in a position to use his/her official position to help Leonard.  Leonard was not confident that Person C would have supported the stop-arm program and his other business interests absent bribe and kickback payments because, based on Leonard's experience, Person C did not do anything unless he/she got paid.  Leonard expected Person C's unconditional support in exchange for the stream of benefits Person C received.  If Person C would have opposed Leonard's efforts, or voted "No" on anything related to the stop-arm program, Leonard would have immediately stopped paying Person C.

28.     In addition to voting for the civil penalty and fine and the promise of support for Leonard's real estate plans, Person C also voted and advocated vigorously for a 2015 City Council motion which renewed the interlocal agreement with DCS to administer and enforce the stop-arm program for an additional twenty-five years, and, on

another occasion, Person C pressured the Dallas City Attorney's Office to project a favorable view of the program to another Texas municipality.

29.     The defendant agrees that the defendant committed all the essential elements of the offense(s).  This factual resume is not intended to be a complete accounting of all the facts and events related to the offense charged in this case.  The limited purpose of this statement of facts is to demonstrate that a factual basis exists to support the defendant's guilty plea to Count(s) One of the Information.

AGREED TO AND STIPULATED on this _6_ day of _11/18_____, 201_.

ROBERT CARL LEONARD, JR.
Defendant

ERIN NEALY COX
UNITED STATES ATTORNEY

CHRISTOPHER W. LEWIS
Attorney for Defendant

ANDREW O. WIRMANI
Assistant United States Attorney
Texas Bar No. 24052287
Dallas, Texas 75242-1699
Tel: (214) 659-8600
Fax: (214) 659-8809
Email: andrew.wirmani@usdoj.gov