UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF TEXAS
DALLAS DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | No. 3:18-CR-00410-M-1 |
| | ) | |
| ROBERT C. LEONARD, JR., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |


SENTENCING HEARING
BEFORE THE HONORABLE BARBARA M.G. LYNN
UNITED STATES DISTRICT COURT JUDGE
MAY 15, 2019
DALLAS, TEXAS

FOR THE PLAINTIFF:

    ANDREW O. WIRMANI
    OFFICE OF U.S. ATTORNEY - NDTX
    1100 Commerce Street, Suite 300
    Dallas, TX  75242
    (214) 659-8600

FOR THE DEFENDANT:

    CHRISTOPHER W. LEWIS
    CRAIN LEWIS, LLP
    3400 Carlisle Street, Suite 200
    Dallas, TX  75204
    (214) 522-9404


    Proceedings reported by mechanical stenography;
transcript produced by computer-aided transcription.
_____

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
Federal Official Court Reporter
1100 Commerce Street, 15th Floor
Dallas, TX  75242
(214) 753-2325

I N D E X

MAY 15, 2019

| Plaintiff's Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| PHILIP STEPHENSON | 9 | 19 | | |

| Defendant's Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| ROBERT LEONARD | 27 | 29 | | |

CHARACTER WITNESSES

| | | |
|---|---|---|
| LIZ MICHENER | 41 | |
| NICOLE LEONARD | 43 | |
| LINDA LEONARD | 46 | |

```
 1                    (PROCEEDINGS BEGAN AT 2:05 PM.)

 2              THE COURT:  All right.  The Court calls

 3    Robert Leonard.

 4              Mr. Lewis -- I'm going to review, Mr. Leonard, with

 5    you and your counsel what I have in my file to make sure

 6    there's nothing that I have not received that you all intended

 7    for me to have.  I'm going to begin at the end.

 8              Sent to us yesterday were two handwritten letters

 9    from -- it sounds like friends of your since you were a kid.

10    It's a little bit hard for me to read.  I think it's

11    Darius Swangstue, S-W-A-N-G-S-T-U-E, and Hank Mauer,

12    M-A-U-E-R.  I have reviewed those letters.  Additional letters

13    that I have and have reviewed:  Raymond Bretz, B-R-E-T-Z, and

14    Vincent Palumbo, P-A-L-U-M-B-O.

15              The Court has the Presentence Report.  Have you

16    reviewed that, Mr. Leonard?

17              THE DEFENDANT:  Ma'am, I can't hear you.

18              THE COURT:  Have you reviewed the Presentence Report?

19              THE DEFENDANT:  Yes.

20              THE COURT:  Do you know of any mistakes in that that

21    need to be corrected other than those that have been pointed

22    out by Mr. Lewis in the objections he filed on your behalf?

23              Look at me, Mr. Leonard.  If you don't understand me,

24    ask me.  You don't understand me?

25              THE DEFENDANT:  I can't hear you.
```

```
 1              THE COURT:  Okay.  Do you have the devices Amanda
 2    that we could provide?
 3              Okay.  We'll take a break here for a minute.  It's
 4    important you hear me.
 5              MR. LEWIS:  Your Honor, I have one more thing that I
 6    received yesterday that was from a Dr. Charles Smith regarding
 7    an office visit that Mr. Leonard had on April the 30th of this
 8    year.  May I approach and tender that to the Court?
 9              THE COURT:  Is this the last of it?
10              MR. LEWIS:  Yes, and it's very short.
11              THE COURT:  Okay.  Can you hear me now, Mr. Leonard?
12    Can you hear me?
13              THE DEFENDANT:  It doesn't do anything.  All it has
14    is static.
15              MR. LEWIS:  I can -- I'm standing beside him and I
16    hear it, too.  It sounds just like that.
17              THE DEFENDANT:  It doesn't project your voice.  I'm
18    sorry.
19              THE COURT:  Would you pass that up, Mr. Lewis?
20              MR. LEWIS:  Yes, ma'am.
21              THE COURT:  Okay.  Our stuff is not working, so I'm
22    going to try really raising my voice, Mr. Leonard.  So I'm
23    going to put this right in front of me.  I'm going to talk
24    very loud.  Can you hear me now?
25              THE DEFENDANT:  I got it.
```

1          THE COURT:  All right.  I'm going to talk that loud

2    the whole time.  And if you can't hear me, then you need to

3    give me a wave and I'll shout it.  Okay?

4          THE DEFENDANT:  That's fair enough.

5          THE COURT:  All right.  Okay.  So do you know of any

6    mistakes in the Presentence Report that have not been pointed

7    out to me by Mr. Lewis?

8          There were some factual corrections that were made.

9    I'll give you an example because I think this will help you

10   remember.

11         There was a statement in the Presentence Report that

12   Mr. Sorrells attended the wedding of your daughter and, in

13   fact, that was wrong because your daughter is not married and

14   what it should have said, as I remember, is that you attended

15   the wedding of Mr. Sorrells' son.  So that's the kind of thing

16   that Mr. Lewis would not know unless you told him.  So that is

17   an example of something that must have been corrected because

18   you brought it to your lawyer's attention, and that tells me

19   that you reviewed the Presentence Report and told Mr. Lewis

20   where there were mistakes and he pointed them out to me.  Is

21   that a fair conclusion?

22         THE DEFENDANT:  Yes, ma'am.

23         THE COURT:  Okay.  All right.  Now there is a

24   substantive difference between the parties that we will get

25   back to that relates to restitution, although I will say that

1    this issue of the amount of restitution being 137 million

2    dollars or 70 plus million dollars is academic.

3              Would you agree, Mr. Wirmani.

4              MR. WIRMANI:  I would, Your Honor.

5              THE COURT:  Okay.  It's not that I don't think that's

6    a lot of money, but I don't think that is significant and not

7    that I don't think the difference between those numbers is not

8    an astronomical figure and not that I'm not going to hear

9    testimony on it, but the prospect that Mr. Leonard will be

10   able to repay that is, to say the least, remote.  But there is

11   an issue there, and the Court will hear limited testimony on

12   that.

13             To the extent there is an objection about Mr. Leonard

14   qualifying as a leader and organizer or otherwise satisfying

15   the provision that would allow for that enhancement, the Court

16   overrules the objection.

17             The Court is of the view that *Sentencing Guidelines*

18   3B1.1(a) is satisfied; that the unindicted co-conspirator,

19   whose initials are R.R., does qualify as a participant, but

20   even if he doesn't, the Court concludes that the criminal

21   activity was otherwise extensive as that phrase is used in

22   Sentencing Guideline 3B1.1, Comment Note 3, and case law out

23   of the Fifth Circuit and, therefore, the Court concludes that

24   that enhancement was properly applied.  That is Objection No.

25   3 which is overruled.

1          Objection No. 1 is a correction that was accepted.

2          Objection No. 2 provides certain additional

3     information that Mr. Leonard wants the Court to know about his

4     state of mind.  The Court will take that as Mr. Leonard's

5     statement of his state of mind in what he told the FBI.  The

6     Court does not believe that necessitates any further

7     modification to the Presentence Report.

8          Objection No. 4 relates to the loss amount and

9     restitution subject on which I will hear limited testimony.

10    And, again, that number that the defense is urging is

11    $79,861,702.40.  So the difference between the parties is

12    roughly 58 million dollars.

13         And the other objections are cumulative of those

14    asserted before.  And Objection 7 states the position of the

15    Defendant; that the Court should sentence him outside the

16    Guidelines.

17         So I have the Presentence Report, and I've ruled on

18    the objections of the Defense; the addendum to the Presentence

19    Report; Government's statement of no objections; the

20    Government's response to the defense objections; the

21    Government's motion of May the 7th, 2019, which the Court

22    grants; Government's statement of no objections to the

23    addendum; Mr. Leonard's sentencing memorandum.

24         Is there anything further that I have not listed that

25    I should have?

1    I also have what Mr. Lewis just handed up to me which

2    is a follow-up office visit to Dr. Smith dated April the 30th,

3    2019, that I reviewed when it was handed up to me.  Anything

4    else?

5         MR. LEWIS:  Nothing -- Nothing further from us,

6    Your Honor.

7         MR. WIRMANI:  Not from the Government, Judge.

8         THE COURT:  All right.  So do you have any witnesses

9    that you intend to call, Mr. Lewis?

10        MR. LEWIS:  Just that speak to his character, three

11   witnesses.

12        THE COURT:  Okay.  Then I think I'll hear from your

13   witness on loss, Mr. Wirmani.

14        MR. WIRMANI:  Yes, Your Honor.  Your Honor, the

15   Government calls Agent Phil Stephenson.

16        THE COURT:  If you would stand right here in front of

17   the court reporter, please.  Raise your right hand, please,

18   and state your full name and spell your last name.

19        THE WITNESS:  Philip Stephenson, P-H-I-L-I-P; last

20   name is Stephenson, S-T-E-P-H-E-N-S-O-N.

21             (The Witness, PHILIP STEPHENSON, Is Sworn.)

22        THE COURT:  Okay.  Thank you.  Be seated right there.

23        All right, Mr. Wirmani.

24        MR. WIRMANI:  Your Honor, before I begin asking

25   questions, I just kind of want to set the stage in terms of

1   how we see the restitution issue, if that's permissible.

2              THE COURT:  Okay.

3              MR. WIRMANI:  We certainly understand it's our

4   ultimate burden to prove loss for restitution purposes.

5              We also agree that direct costs, to the extent that

6   they're proven, should be deducted from the loss amount.

7              I think the Fifth Circuit case law is a little

8   nuanced in terms of the burden.  The Government retains the

9   ultimate burden to prove the loss amount, but to the extent

10  that there is an allegation of a direct cost --

11             THE COURT:  They have to prove that.

12             MR. WIRMANI:  -- we believe that they have to at

13  least come forward with some evidence.

14             THE COURT:  I agree with you.  How could you be

15  required to prove that?

16             MR. WIRMANI:  Thank you, Your Honor.  With that said,

17  we'll go through all of the challenged restitution figures

18  with testimony.

19             THE COURT:  Okay.  All right.  Let me -- And let me

20  have that handy so -- If that's the way you're going do it,

21  let me have that handy.  That would be helpful to me.  Okay.

22                         DIRECT EXAMINATION

23  QUESTIONS BY MR. WIRMANI:

24  Q    State your name for the record, sir.

25  A    Philip Stephenson.

1   Q    And, Mr. Stephenson, what do you do for a living?

2   A    A Special Agent for FBI.

3   Q    And are you one of the agents involved in the

4   investigation of Dallas County Schools and Mr. Robert Leonard?

5   A    I am.

6   Q    And is it fair to say that you primarily worked or did

7   substantial work on the financial side of the case?

8   A    It is.

9   Q    Subpoenaed bank records from a number of different

10  institutions?

11  A    Yes.

12  Q    Reviewed those bank records, along with the invoices that

13  were collected through search warrants and other means?

14  A    Yes.

15  Q    And we've discussed prior to today some contested areas

16  of restitution in this case?

17  A    Yeah.

18  Q    All right.  I want to start with the sale lease-back.

19  Are you familiar with what the sale lease-back aspect of this

20  case was?

21  A    I am.

22  Q    Can you briefly describe to the Court what that

23  transaction was and what the purpose was and how it relates to

24  the criminal conduct?

25  A    So the sale lease-back was a means for Dallas County

1    Schools to take property that they owned outright, they owed

2    no money on it, and sell it through an RFP because they were

3    lacking cash at the time.

4         So what they did was the property was valued at

5    approximately 18 million dollars, and they took multiple bids.

6    The winning bid came out at 25 million dollars, and Dallas

7    County Schools received approximately 22.6 million dollars.

8         Their -- The next part of that transaction was that

9    they turned around and leased those properties back from the

10   company, known as Wedgewood Investments, for the life of --

11   I'm not sure of the terms of the agreement, but I believe the

12   total amount that they ended up owing the company they sold it

13   to was 44.5 million dollars.

14   Q    Okay.  And this 44.5 million dollars, that's on top of

15   what they already received back.

16   A    Yes.

17   Q    The Dallas County Schools received back.  So the school

18   district undertook an obligation of approximately 40 million

19   dollars pursuant to this -- this deal.

20   A    Yes, I believe so.

21   Q    And is it your understanding that a certain portion of

22   that has already been paid pursuant to the lease payments?

23   A    Yeah.  Approximately 8 million dollars has been paid.

24   DCS has paid approximately 8 million dollars to that company.

25        THE COURT:  Can I see counsel up here for a moment?

1          (An off-the-record discussion was had between the

2   Court and counsel.)

3          THE COURT:  Court's going to take a two-minute

4   recess.

5          COURT SECURITY OFFICER:  All rise.

6          (Court recessed from 2:22 PM until 2:26 PM.)

7          THE COURT:  All right.  Thank you very much.  All

8   right.  You can pick up where you were, Mr. Wirmani.

9                   CONTINUED DIRECT EXAMINATION

10  QUESTIONS BY MR. WIRMANI:

11  Q    Agent Stephenson, you mentioned approximately 8 million

12  dollars had already been paid by Dallas County Schools to

13  Wedgewood pursuant to this lease-back deal, correct?

14  A    Yes.  I believe that Wedgewood turned around and sold

15  that.  So they had paid that money back to whoever owns the

16  rights to that contract now.

17  Q    Who owns the lease at this point.

18  A    Yes.

19  Q    And approximately 24 million dollars remains outstanding

20  that now the Dissolution Committee continues to owe under this

21  lease?

22  A    Correct.

23         THE COURT:  Okay.  Mr. Wirmani, if I have to shout so

24  that the Defendant can hear me, you have to shout so he can

25  hear you.

13

1                    MR. WIRMANI:  I can do that, Your Honor.

2     Q    (By Mr. Wirmani) Now there was a lease-back commission of

3     approximately $750,000.  Can you describe to the Court, based

4     on your investigation, how that money was divided, why it came

5     about?

6     A    The lease-back commission was worth $750,000.  It was

7     paid from a combination of Dallas County Schools in 2015

8     acquisitions which is Wedgewood DBA.  It was paid to a company

9     called Anrock Realty.  Anrock Realty is owned by

10    Slater Swartwood, Jr., who is an associate of Mr. Leonard and

11    an associate of Rick Sorrells.  And the way that commission

12    was broken up was 250 stayed in Slater Swartwood's account,

13    $250 went to Robert Leonard, and $250 went to Rick Sorrels.

14    Q    Now did -- Mr. Swartwood, did he represent Wedgewood with

15    respect to this lease-back transaction?

16    A    No.  Slater Swartwood represented a company called

17    Realterm Investments; Realterm NAT.  I'm not sure of the exact

18    name, but they were the second option chosen by DCS.

19    Q    So why was the commission paid to Mr. Swartwood?

20    A    It was part of this scheme; that Robert Leonard believed

21    that Rick Sorrells was owed some money.  Rick Sorrells did no

22    work on this sale lease-back, and so all three of them got a

23    cut of this.

24    Q    Okay.  And the $250,000 you mentioned went back to

25    Mr. Sorrells, correct, the Superintendent of DCS?

1  A    Yes.

2  Q    Was Mr. Sorrells also the one that ultimately approved,

3  in conjunction with the Board, the lease transaction with

4  Wedgewood?

5  A    I think it's safe to say that Rick Sorrells was the one

6  that brought this before the Board who typically followed the

7  direction of Dr. Sorrells, but ultimately it was the Board

8  President that signed that contract.  But, yes, Rick Sorrells

9  did promote this for the Board.

10  Q    Okay.  So through Mr. Leonard, Mr. Sorrells effectively

11  received a kickback on a DCS transaction that he was in charge

12  of on the DCS side.

13  A    Absolutely.

14  Q    Now based on your investigation, were there subsequent

15  efforts to deal with this $250,000 that was paid to

16  Mr. Sorrells?  To attempt to conceal it?

17  A    Yes.  All three parties involved were concerned with how

18  the $250,000 for each individual would be explained.

19  Initially, it was talked about as a loan or as a 1099, fees as

20  a contractor.  Ultimately, it was -- you could say it was

21  rolled into the overall note, the falsified note that

22  Rick Sorrells had.

23  Q    Okay.  And based on your investigation, was that

24  consistent with other ways that the co-conspirators attempted

25  to conceal their criminal conduct?

1   A    Yes.

2   Q    I'm not sure we mentioned it, but what was the impetus?

3   Why would Dallas County Schools take a piece of land that they

4   owned free and clear, sell it, and then lease it back at a

5   substantially higher cost?  What were they trying to

6   accomplish?

7   A    Dallas County Schools had no cash at the time.  This was

8   a way to influx cash into the agency.  And the only reason

9   that they were out of cash at the time was due to this

10  stop-arm program.

11  Q    Okay.  So this was effectively a way to get cash to pay

12  for additional cameras pursuant to this criminal scheme.

13  A    Yes.  That money went into that account that directly

14  bought cameras as well.

15  Q    There is $300,000 in the PSR attributable to ELGA

16  financing fees.  Can you tell the Court what that is?

17  A    So ELGA is a company also owned by these same people who

18  owned Wedgewood Investments.  They were a third-party

19  financier.  So what they would do is whenever DCS needed to

20  purchase cameras, they didn't have the money on hand, so they

21  would finance these cameras through ELGA.  ELGA would contract

22  with another bank who would release that money to RPI

23  Technologies which was a subsidiary of Force Multiplier

24  Solutions.  And then ELGA would get paid a financing fee for

25  that.

1    Q    So these were fees that DCS paid effectively to get

2    additional cameras.

3    A    Yes.

4    Q    There's $200,000 in the PSR listed as Elf Marketing fees.

5    Can you tell the Court what's that attributable to?

6    A    Elf Marketing is a company owned by Slater Swartwood, Jr.

7    He was an employee of Force Multiplier Solutions, and it is

8    our understanding that his role was to reach out to other

9    school districts to get them on board with this program that

10   was being run through DCS.  Originally, Elf Marketing started

11   out working through or for Force Multiplier Solutions but then

12   once DCS purchased the licensing rights for the State of

13   Texas, they took on that expense from Force Multiplier

14   Solutions and paid Elf Marketing.

15   Q    Okay.  So these are expenses that DCS paid in an attempt

16   to spread the stop-arm program across the State of Texas

17   effectively.

18   A    Yes.

19   Q    And that would be pursuant to the licensing agreement

20   that DCS purchased from Force multiplier Solutions induced by

21   the bribe payments.

22   A    Correct.

23   Q    Okay.  Let's move on to the issue of direct costs.  Now

24   the cameras that Force Multiplier Solutions sold to DCS, did

25   it manufacture those cameras itself or did it purchase them

1   wholesale from a different party?

2   A    They purchased them from a company called "ICTC" which

3   stands for "Interconnect Cable Technologies Company."

4   Q    And pursuant to this investigation, have you obtained

5   bank records and other documents that allow you to estimate

6   the amount of costs that Force Multiplier Solutions paid to

7   get the cameras that they ultimately sold to DCS?

8   A    Yes.  I reviewed ---

9        THE COURT:  I couldn't hear the last part of your

10  question.  I don't have my Sametime -- realtime up here.

11       MR. WIRMANI:  I got you, Your Honor.

12  Q    (By Mr. Wirmani) It may be a better question:  Do you

13  have an estimate, based on your investigation, of Force

14  Multiplier Solutions' direct costs, wholesale costs, on the

15  cameras that they ultimately sold to DCS?

16  A    Yeah.  What I added it up to be was a little over 8

17  million dollars paid to ICTC.

18  Q    Okay.  So not 28 million dollars.

19  A    No.

20       THE COURT:  Is that 8 million figure reduced in the

21  Presentence Report?

22       MR. WIRMANI:  It is not.

23       THE COURT:  Okay.  All right.

24       MR. WIRMANI:  I just want to make sure the

25  restitution judgment is ultimately accurate because it's a hot

1    button issue on appeal.

2              THE COURT:  All right.

3    Q    (By Mr. Wirmani) And finally, Mr. Stephenson, there's an

4    issue of wages that Force Multiplier Solutions paid to its

5    employees.  Now based on your investigation, is there any way

6    to determine whether those employees were solely dedicated to

7    the contract between Force Multiplier Solutions and DCS or did

8    Force Multiplier Solutions have other clients that these

9    employees potentially were doing the work for?

10   A    I'm not sure of the exact number of employees that worked

11   for Force Multiplier Solutions, but thinking on that issue,

12   the only way you would be able to find out is if you went and

13   interviewed every single employee and broke down the time that

14   they spent working on each different project; an extremely

15   arduous task.

16   Q    So suffice it to say that based on your years of

17   investigation, you cannot say that these -- the wages to these

18   employees were direct costs as opposed to indirect costs that

19   benefited multiple clients with Force Multiplier Solutions.

20   A    Correct.

21             MR. WIRMANI:  I think I have nothing further at this

22   time, Your Honor.

23             THE COURT:  So the Government's position is that the

24   137 million plus figure should be reduced by 8 million

25   dollars?

1              MR. WIRMANI:  Correct, Your Honor.

2              THE COURT:  All right.  Thank you.  Okay.  Mr. Lewis?

3              MR. LEWIS:  Thank you, Your Honor.

4                         CROSS EXAMINATION

5    QUESTIONS MR. LEWIS:

6    Q    Agent Stephenson, you and I know each other; correct?

7    A    Yes, sir.

8    Q    We've spoken on a number of occasions, right?

9    A    Yes, sir.

10   Q    All right.  Regarding the sale lease-back, just briefly,

11   I'm going to go through this.  You said that the -- the

12   purpose behind that was an infusion of cash for DCS because

13   they were broke at the time, correct?

14   A    Correct.

15   Q    Ultimately what happened was DCS put out an RFP, and that

16   was for approximately 18.7 million dollars, correct?

17   A    Correct.

18   Q    In fact, they ended up selling it for approximately 6

19   million dollars higher than the RFP.

20   A    Correct.

21   Q    Is that true?

22        Now through your investigation, did you learn that

23   there was an alternative purpose besides just the immediate

24   cash infusion?

25   A    I did not.

1  Q    Okay.  Did you ever hear -- Well, let me lay the

2  foundation real quick.  It's fair to say that DCS serviced a

3  number of school districts around the metroplex.

4  A    Yes.

5  Q    Do you know approximately how many?

6  A    Over ten; not sure of the exact number.

7  Q    So the school districts that it serviced, did DCS --

8  Well, first of all, did DCS own that land?

9  A    It did.

10 Q    They owned the land free and clear, correct?

11 A    Yes.

12 Q    At one point somebody from DCS went to the City

13 Attorney's Office to try to figure out if they could get a

14 mortgage on that property, correct?

15 A    I'm not sure of that.

16 Q    Okay.  In essence, because DCS owned that property free

17 and clear, the benefit went to the various school districts

18 that DCS served because they didn't have any costs associated

19 with where they parked the bus; true?

20 A    Yes.

21 Q    DCS was not able -- Because they owned the land free and

22 clear, they were not able to create a line item for each of

23 the various school districts so that the various school

24 districts were actually having to pay to park the buses where

25 they were parked.

1  A    Correct.  There was no charge to anyone since they owned

2  that land.

3  Q    Right.  In doing a sale lease-back, the lease-back

4  portion required DCS to pay a lease for that land that they

5  had sold, that they previously owned, --

6  A    Correct.

7  Q    -- in order to continue using it.

8  A    Yes.

9  Q    Now since DCS had something they had to pay out for the

10  land, that then gave them the opportunity to create a line

11  item and charge the various school districts a portion of

12  money to park their vehicles on that land.

13  A    Yes.

14  Q    Do you know if that was ever implemented?

15  A    If they passed that -- the expense on to the school

16  districts?

17  Q    Yes, sir.

18  A    I believe they have.

19  Q    Okay.  Now do you know -- I know we've heard all these

20  figures about what this was going to cost taxpayers in

21  perpetuity and that amount has been added to this restitution

22  figure.  Do you know if the school districts actually paid any

23  money to park their buses there pursuant -- I mean after the

24  sale lease-back occurred?

25  A    I'm not sure.

1    Q    You don't know if that number has ever been calculated.

2    A    Correct.

3    Q    Okay.  Do you know -- Did you know what the amount was,

4    the line item amount?

5    A    I have seen numbers, but it would be hard.  I can't

6    answer that confidently.

7    Q    Okay.  Now I believe that you told the Court that you

8    came up with a number.  Let's move on now to the amount that

9    Force Multiplier paid in order to get the cameras, what

10   they -- what they paid the wholesaler.

11   A    Correct.

12   Q    And by the "cameras," we're not just talking cameras.

13   We're talking about the entire system, correct?

14   A    Yes.

15   Q    All right.  Do you know how much they paid the

16   wholesaler?

17   A    Force Multiplier?

18   Q    Correct.

19   A    I calculated somewhere in the -- about 8 million dollars;

20   approximately 8 million dollars.

21   Q    I'm sorry.  Let me ask a better question.  Do you know

22   how much they paid per unit?

23   A    I do not.

24   Q    Now your calculation of the 8 million dollars comes from

25   a review of bank accounts?

1    A    Yes.

2    Q    Okay.  Does it come from a review of checks or some other

3    payment form to the wholesaler?

4    A    You know, someone has scheduled the accounts, and so

5    every time ICTC was paid out of a Force Multiplier account,

6    that's the -- that's the figures that I have counted up.

7    Q    Okay.  So you stated and it's fair to say that you don't

8    know what Force Multiplier was paying per unit, --

9    A    Correct.

10   Q    -- correct?

11        Do you know what Force Multiplier was charging DCS

12   per unit?

13   A    Approximately $10,000.

14   Q    Were you aware that for the first 2000 units sold to DCS,

15   that they charged 8500 as opposed to $10,000?

16   A    I've seen different figures.  At different times they're

17   charged different amounts.  The average price was $10,000 a

18   unit.

19   Q    DCS not only bought cameras for DCS, they -- they bought

20   them for other school districts as well, correct?

21   A    Correct.

22   Q    Because at some point they purchased the licensing

23   agreement, and then they started selling these units across

24   the state.

25   A    Correct.

24

1   Q    So they -- they bought units for other school districts,

2   and they had some that were in their inventory because they

3   were -- they were continuing to push this product to other

4   school districts.

5   A    Correct.

6   Q    Do you know how many total units that DCS bought for

7   themself and for sale to other school districts?

8   A    I know that DCS had approximately 1600 buses in their

9   fleet.  So any number over that would have been for other

10  school districts.

11  Q    Because as you've told me and we know, DCS was trying to

12  put these units on all of the buses that they owned.

13  A    Correct.

14  Q    Okay.  So we know that there's a minimum of 1600 or

15  thereabouts, but you don't know how many -- You know more than

16  that were purchased because some were purchased for other

17  school districts.

18  A    Yes.

19  Q    Okay.

20       MR. LEWIS:  Your Honor, that's all I have for Agent

21  Stephenson right now.

22       THE COURT:  Anything further, Mr. Wirmani?

23       (Witness started to leave the witness stand.)

24       MR. WIRMANI:  Apparently not.  No, Your Honor.

25       THE COURT:  The witness doesn't get to decide that.

```
 1            All right.  Well, I don't -- Let me begin with the
 2    $4,020,000 that the defense claims are wages that the Court
 3    should deduct.  I'm not going do that because I haven't got
 4    sufficient evidence to conclude that those wages are
 5    attributable to this particular company.
 6            MR. LEWIS:  Your Honor, may I interrupt?  We actually
 7    have something to offer.
 8            THE COURT:  Okay.  I thought you didn't.  I asked you
 9    what evidence you had to present.  What do you have?
10            MR. LEWIS:  Oh, no.  I was -- And I spoke to
11    Mr. Wirmani, and I've got -- I've got figures, not that relate
12    to what you're going over now but what you're about to as far
13    as the number of units and that type of thing.  And I can
14    either do a proffer or Mr. Leonard can testify to that.
15            THE COURT:  Okay.  I -- Maybe my question earlier was
16    not clear which was intended to find out if you were putting
17    on any evidence with respect to matters other than the
18    character of the Defendant.  So I guess you're telling me now
19    you are.
20            MR. LEWIS:  Well -- So -- I mean that's my fault,
21    Judge.  I thought that Mr. Wirmani and I were talking ---
22            THE COURT:  Okay.  Let's just get on it with it.
23            MR. LEWIS:  Sure.
24            THE COURT:  If you're going to, what are you ---
25            MR. LEWIS:  If it pleases the Court, can I do -- can
```

```
1    I do a proffer?  I think that would be faster.

2          THE COURT:  Well, I don't know whether you can do a

3    proffer or not.  Who -- Who would be the witnesses here who

4    would testify?

5          MR. LEWIS:  Mr. Leonard.

6          THE COURT:  Okay.  Well, I'm not -- That's not going

7    to cut it.  I'm not going to let you proffer what Mr. Leonard,

8    the Defendant, would be saying without the Defendant being

9    subject to Cross Examination.

10         MR. LEWIS:  That's no problem.

11         THE COURT:  Okay.  So ---

12         MR. LEWIS:  I'll call Mr. Leonard briefly.

13         THE COURT:  Okay.  All right.  Mr. Leonard, come on

14   up.

15         MR. LEWIS:  Go up to the witness stand.  I'm going to

16   ask you some questions about cameras.  Watch your step.

17         THE COURT:  All right.  Mr. Leonard, come on up here;

18   stand in front of the court reporter, please.  Raise your

19   right hand.  Raise your right hand.

20              (The Defendant, ROBERT LEONARD, Is Sworn.)

21         THE COURT:  All right.  Do you waive your rights

22   under the Fifth Amendment not to testify?

23         THE DEFENDANT:  Yes.

24         THE COURT:  Okay.  Have a seat.

25         MR. LEWIS:  May I proceed, Your Honor?
```

```
 1              THE COURT:  Yes.

 2                       DIRECT EXAMINATION

 3   QUESTIONS BY MR. LEWIS:

 4   Q    Mr. Leonard, briefly, we're going to ask the same

 5   questions that we were talking about a while ago.  The units

 6   that went inside and outside the buses, you all purchased

 7   those from a wholesaler?

 8   A    Yes.

 9   Q    How much did those units cost Force Multiplier?

10   A    The entire package --

11   Q    Yes.

12   A    -- or individual pieces of it?

13   Q    No.  The entire package that you then sold to -- We're

14   going to talk about the entire package.  How much did it cost?

15   A    It costs approximately $4700.  It would change,

16   obviously, from time to time as the wholesaler would change

17   its prices but, generally speaking, about $4700.

18   Q    Okay.  You would then sell those units to Dallas County

19   Schools, DCS; correct?

20   A    Correct.

21   Q    All right.  How much did you sell those units to Dallas

22   County -- that unit, one unit, to Dallas County Schools?

23   A    That kit?

24   Q    The kit; yes, sir.

25   A    The kit was sold to them for $10,000 but a thousand of
```

1    the 10,000 was installation.

2    Q    Okay.  So they were $9000 and then $1000 was labor.

3    A    Yes.

4    Q    Okay.  So $10,000.  How many units did Force Multiplier

5    sell to Dallas County Schools, both for their own use and for

6    them to sell to other school districts?

7    A    The best -- Keep in mind we've sold the company, so we do

8    not have the computer records, but the best number that we

9    have is approximately 5200.

10   Q    Okay.  5200 individual units.

11   A    Kits.

12   Q    I'm sorry; I call them "units;" kits.  Is that right?

13   A    Correct.

14   Q    All right.  Now you had told me that a certain number of

15   those units, that you didn't charge $10,000 dollars, or kits;

16   you didn't charge $10,000; you charged $8500.  Is that

17   correct?

18   A    Yes, sir.

19   Q    Okay.  How many of those units that -- How many of those

20   kits -- Why do I keep saying "units"?

21          How many of those kits that were sold to DCS did you

22   sell for 8500?

23   A    Approximately 2000.  That was our initial in Dallas

24   County.  And so we put the stop-arm system on there for no

25   expense to them.

1    Q     I don't understand what that means.

2    A      In other words, we -- we gave the stop-arm portion of the

3    kit for free.

4    Q    Okay.  And let me clarify that to the Court.  The actual

5    stop-arm portion of the kit was $1500.

6    A    Correct.

7    Q    So for the first 2000 kits, you gave DCS the benefit of

8    the stop-arm, that $1500, without charging them --

9    A    Correct.

10    Q    -- for that.

11          Okay.  But for the other 3200, they were charged for

12    the entire kit, including the stop-arm.

13    A    Yes.

14    Q    And that was $10,000 for each kit.

15    A    9000, plus 1000 for installation.

16          MR. LEWIS:  Okay.  I'll pass the witness.

17          THE COURT:  Cross Examination?

18                    CROSS EXAMINATION

19    QUESTIONS BY MR. WIRMANI:

20    Q    Mr. Leonard, how are you?

21    A    Good to see you again.

22    Q    Good to see you.

23          Did -- During this time period about 2011 -- During

24    the time period of 2011 to 2016, did Force Multiplier

25    Solutions have any other wholesalers of cameras besides ITH?

1   A    You mean besides ICTC?

2   Q    ICTC.  I apologize.

3   A    No, not that I'm aware of.

4   Q    Okay.

5   A    Now there could have been outside of my purview, but to

6   my knowledge, no.

7   Q    So all you can tell the Court is that Force multiplier

8   Solutions purchased cameras from ICTC?

9   A    ICTC predominantly, and I had done business with them

10  for, you know, 13 years or so.

11  Q    And you testified on Direct that you believe

12  approximately 5200 camera units were purchased and then sold

13  to DCS?

14  A    That's the number that we were able to -- to put together

15  from the material that was left behind after the sale.

16  Q    Okay.

17  A    Yes, sir.

18  Q    That's an estimate based on incomplete records, and you

19  no longer have access to the complete set of records; correct?

20  A    Correct, I do not.

21  Q    And you said $4700 was the wholesale cost that your

22  company would pay?

23  A    Yeah.  At that point in time, it ranged in that 4500 to

24  47, you know, 44, you know; right around that range.

25  Q    And you don't have any reason to dispute that $4700 times

1    5200 is about 24-and-a-half million dollars?

2    A    Yeah, I guess.

3    Q    Okay.

4         THE COURT:  Now wait just a moment because I did that

5    math, too, but I didn't do it the way you did it.  I thought

6    the cost was 4700.

7         MR. WIRMANI:  That's correct.

8         THE DEFENDANT:  That's correct.

9         THE COURT:  So the profit is 4300.

10        MR. WIRMANI:  I'm multiplying the cost to the company

11   times the number of camera units sold.

12        THE COURT:  Yeah, okay.  I just did the reverse of

13   what you did, but you can do it that way --

14        MR. WIRMANI:  Okay.

15        THE COURT:  -- as long as I know whether I'm adding

16   or subtracting.

17   Q    (By Mr. Wirmani) And you listened to Agent Stephenson on

18   Direct, correct?

19   A    I'm sorry; I didn't hear you.

20   Q    You listened to Agent Stephenson on Direct --

21   A    I did what direct?

22   Q    -- Examination?

23        You listened to Agent Stephenson testify on Direct

24   Examination a few minutes ago?

25   A    I think I did.  I think I heard him.

1   Q    And he talked about the process by which he came up with

2   the 8-million-dollar figure, correct?

3   A    Yes.

4   Q    Okay.  Unlike you, he's not using an estimate based on

5   his memory and an incomplete set of records, correct?

6   A    I don't know what he's using.

7   Q    He's actually using the bank accounts of your company

8   from the relevant time period.

9   A    Okay.  So -- But we had already told you that we charged

10  8000 after the first 2000 orders, the first installation.

11  Q    Okay.  And, sir, you understand the issue here is not

12  what you charged Dallas County School.  The issue is what you

13  paid the wholesaler.  That's what we're trying to figure out.

14  A    Right.

15  Q    Okay.

16  A    And what we paid the wholesaler, as I said, was

17  approximately 4500 bucks.

18  Q    Okay.  And you'd agree with me that if we have the

19  complete set of Force Multiplier Solutions' bank records

20  during the relevant time period, it wouldn't be that hard to

21  go back and look at those bank records and look at all of the

22  payments to ICTC; correct?

23  A    That sounds reasonable to me.

24  Q    Were there any payments that you would have made to ICTC

25  that weren't for cameras?  That were for other services?

1    A    Yeah.  There were other parts, you know.  For example,

2    you -- if you have a kit and the kit had a light bulb in it --

3    I'll pick something simple -- a light bulb in it, you know, we

4    would buy the light bulb separate.  So we bought pieces,

5    parts.  We bought modems.  We bought other things from ICTC

6    and -- at a lot less, you know, at a lot lower number because

7    there was only one piece or one part, what have you.  And of

8    that, the majority of it would most probably be modems.

9    Q    Okay.  And all of those other parts, modems, lights, is

10   that all included into what's ultimately sold to DCS in the

11   camera package for 10,000 or 8000 dollars?

12   A    Well, that -- No.  The 10,000 or 8000 dollars is a

13   complete kit.  The pieces, parts and what have you were for

14   things that broke or things that they needed, you know, to

15   replace at some point in time.

16   Q    Okay.  So if we go back and look at those bank records

17   and we see about 8 million dollars going from your company to

18   ICTC during the relevant time period, you don't really have

19   any reason to dispute that, do you?

20   A    To dispute ---

21   Q    That there's about 8 million dollars paid from Force

22   Multiplier Solutions to ICTC -- excuse me -- between about

23   2011 and 2016.

24   A    I wouldn't have paid ICTC 8 million dollars.

25   Q    That is the company you were buying the cameras from, --

1    A    Right.

2    Q    -- the camera packets, correct?

3    A    But that's the price that I charged DCS.  That's not the

4    wholesale price that I bought it from ICTC.

5    Q    No.  I'm representing to you, sir, that we've looked at

6    the bank records from your company.

7    A    Right.

8    Q    We see about 8 million dollars during the relevant time

9    period going from your company to ICTC, correct?  Do you

10   understand that?

11   A    No.

12   Q    Okay.  Do you have any evidence to support the additional

13   -- the approximately 18 million dollars or 15 million dollars

14   that you're claiming you spent on cameras?

15   A    I don't know.

16   Q    Okay.  Were you paying for cameras from some other

17   accounts outside of Force Multiplier Solutions?

18   A    We -- We did -- We did business with one other

19   wholesaler, a local wholesaler in New Orleans.

20   Q    Okay.  For cameras for your New Orleans contracts or your

21   Dallas County Schools contract?

22   A    Dallas.

23   Q    Okay.  And what's the name of that company?

24   A    I don't remember off the top of my head what the name of

25   the company is.  We ultimately stopped doing business with

1    them.  Sorrells didn't like the company.

2    Q    Did you pay that company an additional 15 million dollars

3    for cameras?

4    A    Could have.

5    Q    Okay.  But you don't have any evidence.  That's just

6    your ---

7    A    I don't -- I don't know.  I know that we did some

8    business with them.  I don't know how much.  I could attempt

9    to find out, obviously, but I don't have it off the top of my

10   head.

11   Q    You don't have those records here in court today.

12   A    Right.

13        MR. WIRMANI:  I have nothing further at this time,

14   Your Honor.

15        THE COURT:  All right.  Anything further?

16        All right.  You may step down, Mr. Leonard.

17        THE DEFENDANT:  We're done?

18        THE COURT:  Well, for this part.

19        THE DEFENDANT:  Thank you.

20        THE COURT:  All right.  I'll hear argument.  The

21   Court -- Before you interrupted me, Mr. Lewis, I was saying I

22   didn't have any evidence to substantiate the reduction of

23   wages attributable to the contract with Dallas County Schools.

24   And since I didn't hear any, I assume you're giving up on

25   that.

1        MR. LEWIS:  Sure, Your Honor.

2        THE COURT:  Okay.  So that's $4,020,211.38 that's in

3    your objections.  The Court overrules that request for

4    modification.

5        I'll hear you.  Is what you're advocating now that I

6    should do the calculation of cost of goods for the number of

7    units that were sold based on Mr. Leonard's recollection?

8        MR. LEWIS:  Yes, Your Honor.  It's -- You know, I

9    know Mr. Wirmani was asking for records, and, obviously, he

10   doesn't have them, and the company has been sold and a lot of

11   the records have been transferred to -- to the people that --

12   or to the company that purchased Force Multiplier.

13       The same thing with Agent Stephenson.  Agent

14   Stephenson is testifying on his recollection of records.

15       THE COURT:  I don't think he's -- I don't think

16   that's quite fair.  I think he looked at the records and he's

17   testifying about what the records say.

18       Did I misunderstand that, Mr. Wirmani?

19       MR. WIRMANI:  I believe he looked at the records

20   yesterday, Your Honor.

21       THE COURT:  Yes.  That's what I thought.  And if your

22   complaint is that you don't have the records anymore, what you

23   needed to do was ask the Government to show them to you and

24   Mr. Leonard so that you could look at the records and make the

25   same argument in reverse that they're making, but they've got

1    the records.

2         MR. LEWIS:  Okay.  But they also are not aware of who

3    the other company is that Mr. Leonard did business with as far

4    as a wholesaler.  They don't know -- I would think that they

5    would know how many units were sold.  They're not disputing

6    the cost; the wholesale cost was somewhere between 44 and 4700

7    dollars.  They're not disputing that they purchased those

8    units; at least 1600 of them.  They know it's more than that

9    because they know that DCS was operating outside of Dallas.

10   They know that there was a certain number of units that were

11   still in inventory whenever -- whenever this case came to

12   light.  So they know that the number far exceeds 1600.  They

13   just don't know what that number is.  So there is no dispute

14   over the 44 to 4700 dollars.  The only dispute there is

15   potentially is how many units were sold to DCS.

16        So Mister -- Mr. Leonard says his recollection was or

17   is, based on doing a lot of business with DCS over a

18   significant period of time, was about 5200, and the Government

19   knows because they've also debriefed or Mr. Leonard has

20   debriefed with them six times and probably, I would say, more

21   than 20 hours; that he does have a recollection about these

22   types of things, and he has been able to -- to recite his

23   recollection about very specific business dealings with DCS.

24   So I do think that -- that this number comes with -- his --

25   his number and his recollection does come with some -- some

1    credibility as far as how much was sold to DCS.

2            THE COURT:  All right.  As I understand the testimony

3    I heard, the Government sees a line item paid out to the

4    supplier of the kits.  It's 8 million dollars.  Mr. Leonard

5    has a recollection of it being a larger figure, but it's all

6    based on his recollection.  The Government's testimony is

7    that -- They have given me the total of amounts paid to camera

8    suppliers, and they only know of one.  I don't know how to

9    reconcile what is a recollection based on what the books and

10   records show, and there's no mystery about this because your

11   respective positions are in documentation.  And they've got

12   documents that your client and you, Mr. Lewis, could have

13   looked at and presented to the Court by requiring them to

14   bring them down here.

15           So what I've got is testimony about what the books

16   and records show on the one hand, and on the other hand, I

17   have Mr. Leonard talking to me about his recollection.  "I

18   think we bought from some other company, but I don't know how

19   many units we bought."  That's not the kind of thing that I

20   can use to make a calculation.

21           Mr. Wirmani, is the Government representing to the

22   Court that the 8 million dollars includes everything that the

23   Government believes is the cost for purchasing the kits from

24   whatever company during the relevant time period?

25           MR. WIRMANI:  That's our best reasonable estimate,

1   Your Honor.  Part of the problem here is the actual itemized

2   invoices aren't itemized.  So it's almost impossible to go

3   back and figure out exactly how many cameras were purchased

4   during this time period.  And we think the easiest way to do

5   this is to look at the bank account of Force Multiplier

6   Solutions and see how much it paid the wholesaler during the

7   relevant time period.  I think the testimony from Mr. Leonard

8   was, "We only paid them for cameras or camera-related

9   equipment," and that seems to me to be a reasonable estimate

10  of the direct cost.  And I'll remind the Court:  They have the

11  burden on this issue, and we've really proved it for them.

12          THE COURT:  Okay.  Thank you.

13          All right.  The objections are overruled, but the

14  Court, to the extent that the documents are not necessarily

15  completely reliable in calculating the amount and given that

16  the amounts we are dealing with, as I said at the beginning,

17  are in the world of the theoretical -- I've spent as much time

18  in the world of the theoretical as I care to -- the Court will

19  assume that the total amount is 125 million dollars.

20  Objection's noted on both sides.

21          All right.  Any other objections that the Court has

22  not ruled on?

23          MR. LEWIS:  I don't think so, Your Honor.

24          THE COURT:  Okay.

25          MR. LEWIS:  This was -- This was you going through

```
 1    our objections to the PSR, correct?

 2              THE COURT:  I'm sorry?

 3              MR. LEWIS:  This was you going through our objections

 4    to the PSR, is that true, with us?

 5              THE COURT:  I'm not following your question.  I think

 6    I have ruled on all of your objections, and I'm asking you if

 7    you think I have not.

 8              MR. LEWIS:  No, no.  I believe that you have.

 9              THE COURT:  Okay.

10              MR. LEWIS:  I was just -- I was just confirming.

11              THE COURT:  All right.  Does the Government intend to

12    call any additional witnesses?

13              MR. WIRMANI:  No, Your Honor.

14              THE COURT:  Okay.  All right.  Then I'll hear from

15    the Defense.  You may call your witnesses, and I'll hear from

16    Mr. Leonard after you do that.

17              MR. LEWIS:  Thank you, Your Honor.

18              Your Honor, I would first like to call Liz Michener,

19    M-I-C-H-E-N-E-R.

20              THE COURT:  All right.  If these are character

21    witnesses, it's not the Court's practice to put witnesses

22    under oath for character testimony.

23              MR. LEWIS:  Yes, Your Honor.

24              THE COURT:  All right.  Ms. Michener, you may stand

25    right there and talk to me.
```

1          LIZ MICHENER:  Okay.  Hi, Your Honor.  My name is

2    Liz Michener.  I have worked for Mr. Leonard's company for the

3    past 11 years and have worked directly under Mr. Leonard for

4    the past 8 years.  I started with the company when it was a

5    small start-up company; only in Louisiana; only a few

6    employees.

7          Mr. Leonard was very passionate about child safety.

8    Seeing videos and hearing accounts of abuse and the

9    molestation that happens on school buses would bring tears to

10   his eyes.  He was determined to help create a product that

11   would make school buses safer and deter that behavior.  The

12   product that he created gave school districts realtime access

13   to view the interior of the bus, realtime GPS and vehicle

14   tracking of the bus, and provided two-way communication with

15   the driver.  I believe that these products and services that

16   the company provided are much needed, and I was very proud to

17   work for the company.

18          I started out as a receptionist, and Mr. Leonard saw

19   that I had more potential and started giving me greater

20   responsibilities within the company, and he eventually made me

21   his Executive Assistant.  Mr. Leonard was very loyal to his

22   employees and always tried to promote from within and help his

23   employees reach a higher level.  Mr. Leonard was a tough boss.

24   He expected nothing but your best.  Everyone in the company

25   put in long hours, and it was a lot of hard work, but the end

1    result was a state-of-the-art product that protects children.

2         He always strived to inspire greatness.  He was a

3    boss that you could go to with a problem and he would help to

4    find a solution.  I grew professionally and I learned a lot

5    from his leadership.  The company grew tremendously under his

6    management.  It had contracts with school districts in seven

7    states, had multiple offices, and at one point had over 125

8    employees.

9         Mr. Leonard was always very compassionate and

10   understood the importance of family.  I had two children while

11   working for Mr. Leonard's company.  He was very generous and

12   gave me all of the time that I needed to stay home and take

13   care of my children.  He allowed me to work from home when he

14   was traveling or out of the office.  I worked hard for

15   Mr. Leonard and the company, but he always made sure that I

16   had made my family my first priority.

17        When Mr. Leonard moved back to Louisiana, we started

18   working from his home because of his health issues.  Over the

19   years I've known him, Mr. Leonard's medical conditions have

20   worsened dramatically.  He stopped coming into the office, and

21   he struggled to work through the pain.  He was unable to sit

22   at a desk all day and had trouble focusing.  Mr. Leonard was

23   forced to sell the company at the end of 2017.

24        Not a conversation goes by that he doesn't express

25   his embarrassment or remorse.  Because of his mistakes, he has

1   lost his company, business connections and acquaintances and

2   many great friends.  He's sincerely apologizes to me every

3   time I see him for letting me down.

4           Just hearing stories about his past, I believe that

5   Mr. Leonard has overcome many obstacles and has accomplished

6   great things.  Mr. Leonard is a dreamer and an inventor.  He

7   is always trying to come up with new products or ways to make

8   our world better.

9           Since I've known him, he has talked about starting a

10  nonprofit called "A Moment In Time For The Salvation Of

11  Mankind" to create positive energy throughout the universe.

12  Whether it is starting "A Moment In Time" or another venture,

13  I have no doubt in my mind that Mr. Leonard will continue to

14  do great things in the future, and I look forward to seeing

15  what he will bring to fruition next.

16          THE COURT:  Thank you, Ms. Michener.

17          All right.  Call your next witness.

18          MR. LEWIS:  Your Honor, we'd like to call

19  Nicole Leonard, his daughter.

20          THE COURT:  Okay.

21          NICOLE LEONARD:  Hi, Your Honor.  Thank you for your

22  time.  My name is Nicole Leonard, and I'm Robert Leonard's

23  daughter.

24          I know coming from a daughter's perspective, it's no

25  surprise that I stand before you giving details of the best

```
 1    part of my dad and his love for our family.  It's hard to give

 2    witness or testimony on your father's life in a few brief

 3    minutes, but I'm going to try to do my best.

 4            Sorry.

 5            Through hard work and determination, I watched my dad

 6    make sacrifices in order to send us to Christian schools and

 7    raise us with the right principles and values.  He let those

 8    values and principles down when he spent so many -- Geez, I'm

 9    sorry.

10            THE COURT:  Just take your -- Take time as you need.

11    There's some tissues on the table there.

12            NICOLE LEONARD:  I swore I wouldn't do this.  I'm

13    sorry.

14            THE COURT:  It happens.  Take some water, if you

15    like.  If you need a minute, take it.

16            NICOLE LEONARD:  He let those values and principles

17    down when he spent -- which he spent so many years instilling

18    in us.  When I say "us," I'm referring to me and my brother,

19    Jason.  Unfortunately, due to a tragic car accident, he's no

20    longer with us.  His death has forever changed us.  I know if

21    Jason was still here, he'd be right alongside me speaking on

22    my dad's behalf as well.

23            I also know my dad feels as though he has let us all

24    down.  I know he's embarrassed and ashamed.  My dad's words to

25    me directly were, "This is not the dad you've known; not the
```

1  dad I am.  I'm embarrassed, ashamed, and mortified."

2         However, in light of the depiction of my dad in

3  relation to this case, I would like to define him in the eyes

4  of the people who love him.

5         I remember the time my dad took our childhood friend

6  into our home, fed him, clothed him, and gave him money

7  because he had nobody who cared for him.

8         The dad that I know walked down the streets of

9  New York, passed a homeless woman who was beating the ground

10  out of pain from the cold of winter, and while everyone else

11  walked by, my dad stopped to talk to her.  He then proceeded

12  to buy her a sweatshirt from a vendor and gave her money for

13  food.

14         Although my dad wasn't fortunate enough to have the

15  upbringing he would have liked, he still managed to develop a

16  compassion that we all witnessed on many occasions over the

17  years, given the lack of love and compassion he received.

18         He forged ahead through life determined to be a

19  successful man in both his business and personal life.  He

20  achieved both and, prior to today, has never had any

21  improprieties.  He strived to live his life as a respectable

22  man in his community and a pillar of strength to our family.

23  I know with his age and medical issues, it has hindered him,

24  and I've watched him deteriorate which has affected not only

25  his quality of life but has changed him as a person.

1          He is a father, a grandfather, and a husband to us.

2     The thought of him being taken away from us is unfathomable.

3     I appreciate your consideration or impact this may have had on

4     his story in your decision.  Thank you.

5          THE COURT:  All right.  Thank you.

6          MR. LEWIS:  And finally, Your Honor, his wife, Linda.

7          LINDA LEONARD:  Hi, Your Honor.  How are you?

8          My name is Linda Leonard.  I'm Robert Leonard's

9     ex-wife.  I have known Bob for 20 years.  I was married to him

10    for 12.  We have been through a lot together, including

11    Hurricane Katrina and serious health issues.  I took care of

12    him after his bypass surgery.  He had four back surgeries.  I

13    have a diseased colon, and he has been -- I've been

14    hospitalized twice for a long length of time, and he's been by

15    my side ever since.

16          I'm sorry.

17          When I was in the hospital, he never left my side.

18    He was a great caregiver, and I probably would have died

19    without him.  Bob was a businessman and was always working to

20    provide for us.  He took great pride of his work -- of his

21    work & company, and Bob has had -- has had our -- problems

22    through our years that ultimately ended in divorce.

23          I'm not happy about what he did, but I have forgiven

24    him, and I know that in his heart he's truly sorry.  He is

25    such a kind hearted and generous person, I still love him, and

```
 1    I don't know what I'd do if I didn't have him in my life.

 2              THE COURT:  Thank you.

 3              LINDA LEONARD:  Thank you.

 4              THE COURT:  Is that it?

 5              MR. LEWIS:  Yes.

 6              THE COURT:  Okay.  All right.  Mr. Leonard, come on

 7    up.

 8              Do you want to address the Court, Mr. Lewis, before I

 9    hear from Mr. Leonard or do you want Mr. Leonard to speak to

10    me first, as you prefer?

11              MR. LEWIS:  Your Honor, I'll let him go ahead and

12    speak.

13              THE COURT:  All right.  Mr. Leonard, you have the

14    right to speak to me on any matter that you wish before I

15    sentence you.  So this is the time for you to take advantage

16    of that.

17              THE DEFENDANT:  I'm a little emotional at the moment.

18    I think there's only been two times in my life which you can

19    imagine; going to work at age 9, over that period of time.

20    I'm 71 now.  I've given multiple talks.  There's only been two

21    that I didn't know what to say or how to say it.  The first

22    one was when my son died.  I couldn't come up with any words

23    to bring him back; couldn't come up with any words to heal my

24    family and friends.  All I could do is hope that we could get

25    on the other side of it by reflecting on the celebration of
```

1    his life.

2         The only other time that I've ever had a hard time

3    coming up with the right words is this one.  I don't know how

4    to say you're sorry to people that you've affected, their

5    jobs.  I don't know how to say you're sorry for bringing a

6    system into a state with great intentions of saving lives and

7    keeping kids from committing suicide, keeping children from

8    getting raped on buses, keeping children from having -- being

9    forced to sell drugs and -- and other things, helping the

10   school districts save money through having evidence that they

11   could rely on in the event that there was a problem.

12        And instead of that, I ended up here like this.

13   Instead of helping the state and helping the community saving

14   lives and saving families, I stand here as a criminal, and I

15   accept full responsibility for my actions.  I am heartily

16   sorry and wish that I could, as I wish I could bring my son

17   back, help and reinstate those people to the quality of life

18   that I quite possibly affected in my part of this case.

19        I apologize to the Court.  I apologize to the City of

20   Dallas, Dallas County and any of those that have been affected

21   by my actions.  I'm sincerely sorry.

22        THE COURT:  All right.  Thank you.  All right.

23   Mr. Lewis?

24        MR. LEWIS:  Your Honor, would you like Mr. Leonard to

25   stay up here?

```
1              THE COURT:  If you can, Mr. Leonard; that's
2   preferable.  If your health situation requires that you sit
3   down, then we'll get you a chair and you'll sit right next to
4   the lectern.
5              MR. LEWIS:  Can you stand?  Are you okay standing
6   here.
7              THE DEFENDANT:  I can stand.
8              THE COURT:  All right.  If you need, we'll pull up a
9   chair and you can put up a chair right next to the lectern as
10  you prefer.
11             THE DEFENDANT:  It's okay.
12             THE COURT:  All right.  If you need one, pull it up
13  as we go.
14             All right.  Go ahead, Mr. Lewis.
15             MR. LEWIS:  Your Honor, I'll try to briefly put this
16  together from our perspective.  It's -- I mean it's --
17  Obviously, with any type of white collar crime or bribery or
18  kickback scheme, I mean the first thing that we all see is --
19  is the greed and the greed that motivates it, and the greed
20  for more and for money and that type of thing, and I've really
21  tried to understand.  I mean there was no doubt from very
22  early on that Bob Leonard was going to plead "guilty" to this
23  offense, but I've -- I've kind of tried to understand how he
24  got here.
25             Mr. Leonard, from very early on, I mean when the
```

1    agents showed up at his house to execute a search warrant, he

2    didn't know it was coming.  He waived his *Miranda* rights and

3    spoke to the agents and gave them some information.

4          He then had a lawyer in New Orleans come to his house

5    and spoke with him for a while, and he gave more information

6    to the agents.  Then when -- after he had hired me and we had

7    talked for a while and he made the decision that he wanted to

8    cooperate, he went all in, and he didn't equivocate.  He told

9    what his part was.  He told what the roles of others were.

10         So in trying to prepare today and trying to

11   understand this, what I know is this:  That Mr. Leonard's been

12   a successful law-abiding businessman, citizen, person for the

13   first sixty-something years of his life.  I know I put it in

14   the sentencing memo; he had a very difficult upbringing.

15   His -- His father was a police officer who turned criminal and

16   ended up dying in prison.  He was raised in Section 8 housing.

17   And if you talk to Bob very long, what you figure out is he's

18   really got a heart for people and those that are less

19   fortunate.

20         When his son was 21 years old, he was killed in a

21   traffic accident, and Bob was friends at the time with the --

22   or became friends with the Sheriff of Jefferson Parish in

23   Louisiana who started talking to Bob about all the problems

24   they were having on school buses.  He said, "To be honest, the

25   problems aren't really outside the school buses; the problems

1    are inside the school buses.  This is where we have most of

2    the crimes and the violence and the issues."  And through

3    speaking with the Sheriff, Bob is entrepreneurial.  He's a

4    salesperson.  You can tell it about his personality.  And he

5    wanted -- His primary goal in all of this was he wanted to do

6    something with his life's work that made other people's lives

7    better.  And something he said, I will translate in a second,

8    but, you know, part of his disdain right now and the reason

9    he's upset is because his actions, what was meant for good and

10   to be -- to be his life work in really giving back and trying

11   to preserve families and doing this type of thing, his actions

12   caused the demise of it all.

13          Bob's idea was -- for DCS and these other school

14   districts was essentially a security system, realtime security

15   system inside the buses.  The stop-arm and the cameras,

16   obviously, people speed by buses and that type of thing.  That

17   was just the means that would pay for the system inside the

18   school buses and would pay for the operation of the system.

19   It would also create a safer environment, but what everyone

20   was concerned about is making sure that kids could get to

21   school and from school without experiencing crimes within the

22   confines of a school bus when you only have a bus driver to

23   try to patrol it all.

24          I don't think that we've heard throughout the course

25   of the investigation that the other school districts that they

1    serviced around the country, that there was any impropriety

2    whatsoever.  I think it was unique to Dallas.

3             I don't think that this was just a Bob Leonard

4    problem.  I think that -- I think conspiracies like this, they

5    are, by the very nature, kind of co-dependent relationships.

6    It requires culpability on lots of different parts.

7             The thing that's interesting about this is he didn't

8    -- he didn't bribe people or he didn't provide kickbacks in

9    order to get the business.  He got it legitimately, and what's

10   so hard to understand about this is why they started in the

11   first place.  I understand the theories, but there's not a

12   really definable *quid pro quo* except for this just stream of

13   benefits and knowing that his program is going to be

14   successful because he's essentially given the decision makers

15   what they want.

16            The way this program happened was in 2008 or so,

17   Bob -- 2008, 2009, Bob came forward and pitched the idea of

18   this system to Dallas County Schools.  There was then two or

19   three years of a pilot program and an RFP and all of that, and

20   there were no bribes and kickbacks during that period of time.

21            There were a couple of companies that submitted RFPs

22   or submitted bids.  Bob, his company, won it because he had

23   the best system, and he was the only one -- his company was

24   the only company that could do what Dallas County needed.

25            But at some point in 2011, he and Rick Sorrells by

53

1    that time had become very good friends.  Bob will tell you

2    that he looked at Rick Sorrells as a brother.  This was before

3    any bribe or kickback had ever been paid.  I think he felt

4    that Rick Sorrells worked hard and was not paid enough for the

5    work that he did on behalf of DCS.  He knew that Rick Sorrells

6    had four kids, and I think at least two off them were going

7    through college and he was financially strapped, and Bob

8    started giving him money.  And that was the beginning of the

9    end because it never stopped.  Every time Rick Sorrells had a

10   need, Bob was there to provide for the need.

11        I think Bob tried to justify it by saying, "We're

12   going to go in business after this.  This is a loan; this will

13   be paid back; Rick Sorrells' family has one of the oldest real

14   estate companies in Dallas," and I think Bob went through

15   these justifications in his mind.

16        And then there was Rick Duncan -- I mean -- I'm

17   sorry -- then there was Larry Duncan, and Larry Duncan told

18   him, "These are the people on the City Council that you need

19   to pay.  These are the people that we need to support their

20   campaign.  It's important if your program is going to be

21   successful that you support their campaigns," and he did what

22   he was asked to do.

23        Dwaine Caraway came to him.  I think in some of the

24   materials it says that Dwaine Caraway would call him every

25   single day.  Every time Dwaine Caraway had a financial need,

1    he would come to Bob.  Now that's not just a Dwaine Caraway

2    and Larry Duncan and Rick Sorrells problem; it's a Bob Leonard

3    problem, too, because they knew that they had access to him;

4    he knew he had access to them.  They had a financial need and

5    he provided it.

6          So I think that even the first time the agents came

7    and they executed the search warrant and they talked to

8    Bob Leonard, I think he had a hard time understanding what he

9    did was unlawful until the agents explained it to him.  I

10   think it's in the PSR that he said, you know, "I felt like

11   what I was doing was probably, with the public officials,

12   unethical; I don't think I realized at the time it was

13   unlawful," but he realizes it now, and he realized it from the

14   day that the FBI agents showed it to him from a different

15   perspective.

16         And the one thing that -- Every time he talks about

17   it, Your Honor, he -- he -- I mean I think what Linda said and

18   what Liz said is true.  He's very emotional about it.  And,

19   you know, a lot of times in sentencings you have defendants up

20   here that are so upset with the prospect that they're going to

21   be incarcerated or, you know, they're just trying to save

22   their bacon.  I think what Bob is most upset about is two

23   things.

24         Number one, although he and Linda are divorced, they

25   take care of each other.  They both have had a significant

1    amount of health issues that we provided to the Court within a

2    short period of time.  We're not talking about this has

3    happened ten years ago.  We're talking about right now.  I

4    think they rely on each other for support, and I think that

5    Bob -- I know that Bob is afraid that if he's separated from

6    Linda, it's going to -- it's going to have an extremely bad

7    impact on her mental and especially physical well-being.

8         And the number two thing is the program itself.  He

9    told me yesterday, and this is the part that I will translate;

10   he referenced it in his allocution.  He knows and I think

11   everyone knows that this is a good and righteous and very good

12   program, this stop-arm camera program if it is done the right

13   way.  He knows it was not done the right way, and he feels

14   responsible for it.  And since, obviously, DCS has been

15   dissolved, there is no camera program in Dallas.  Bob feels

16   like -- that he has let down the people in the communities

17   that DCS served.  He feels like if there are things that occur

18   on buses, if there's kids that are hurt because people blast

19   by school buses, if there's no repercussions, there's no

20   reason for them to stop.  If somebody gets hurt, Bob Leonard

21   feels like the blood is on his hands because if he would have

22   just done it the right way, then DCS would still be solvent.

23   They would still be around, and the kids and the school

24   districts that DCS served would have the peace of mind and the

25   parents would have the peace of mind that things are safe on

1    the school buses and things are safe around the school buses.

2    And I think those are the two things that are most perplexing

3    to him and about his conduct and to me as well.  He has stated

4    many times that he's ashamed.  He knows he did wrong.  He

5    wishes he could change it, which he can't, and he's absolutely

6    mortified.

7           I know you have to sentence him, and the Court is

8    going to do -- and I'm not -- you know, there's a 10-year cap

9    on this case.  It would have been a 20-year case.  A 20-year

10   -- 20 years would have been a life sentence, no doubt.  He's

11   71 years old, and he's in bad health.  A 10-year cap, a

12   10-year sentence, I mean we can probably say with a certain

13   amount of certainty that there's a good chance that could be a

14   life sentence for Bob.

15          The Government -- I mean I've had three-level

16   reductions in other cases where defendants did significantly

17   less with the Government, and I know that you read the

18   Government's 5K1 motion.  You're familiar and have already

19   done a sentencing in this case, but they've asked for a

20   three-level.  We are appreciative that they filed a 5K1.  Bob

21   has been of substantial assistance to the Government.  He

22   has -- I think there were some other things that he tried to

23   go over and above with that didn't come to fruition that the

24   Government referenced in the 5K1 motion, and I'd just ask you

25   to consider all of those things.  I think all of those things

1    are pertinent under 3553.  I think his -- his health, his age,

2    his cooperation, but, obviously, also the crime that he

3    committed is a consideration as well.

4            So, Your Honor, I'm not going to propose anything.

5    You are certainly in the best situation to determine what the

6    appropriate sentence is for this case, and -- and we will

7    defer to you.

8            THE COURT:  All right.  Thank you.

9            All right.  I'll hear from you Mr. Wirmani.

10           MR. WIRMANI:  Your Honor, if this case had never been

11   about the merits of the stop-arm program -- I've had repeated

12   conversation with all of these defendants about that -- it may

13   be a good idea; it may not be.  I think it had a lot of goals.

14   I've never doubted that these defendants wanted to help kids,

15   but at the end of the day, while they were doing that, they

16   were also helping themselves.

17           The Court's familiar with the general parameters of

18   this scheme.  From the best I can tell, this is the largest

19   domestic public corruption case involving public officials

20   possibly in history.  I can't find any case that involves four

21   million dollars of bribe payments to public officials.  This

22   scheme is extensive.  It lasted for six years.  The loss is

23   just laughable.  We're talking about it, being theoretical,

24   125 million, 70 million.  That money's never coming back in

25   any approximation to what's really owed.

58

```
 1          You know, I deal with this a lot with white collar
 2   defendants where they say, "Now that you've explained it to
 3   me, I see what did I was wrong," but the reality is if you
 4   look at the facts of what actually happened here, all of these
 5   bribe payments were funneled through shell companies.  The
 6   clear purpose of that is to conceal and disguise what they're
 7   doing.  They have consulting agreements that are later
 8   transferred to loan payments.  There's checks that Mr. Leonard
 9   wrote to Dwaine Caraway, the cash for the Buck & Ruck that say
10   "loan" in the "By" line.  So while they may not wrap their
11   heads around it while they're doing it completely, I think
12   it's fair to say they know that what they're doing is wrong.
13          The PSR, I think, correctly identifies Mr. Leonard as
14   a leader/organizer of the scheme.  I think in cases like this,
15   it's very important that we hold the bribe payers accountable
16   just like we do the bribe recipients.  You know, there's
17   arguments that public officials owe a higher duty to the
18   public and I understand those arguments, but at the end of the
19   day, public officials aren't corrupted by these sort of
20   bribery schemes without the vendors and the businessmen that
21   are willing to get in bed with them and make these types of
22   payments.
23          We did file a motion that the Court has granted.
24   Mr. Leonard did assist the Government.  I think I've laid that
25   out accurately in the motion.  I think it's difficult in a
```

1    case like this when you have multiple cooperators.  I think

2    the Government needs to try to be fair amongst all the

3    defendants, and I think the Court needs to be fair amongst all

4    the defendants on how it comes out in terms of sentencing.  We

5    think the guideline range accurately reflects where

6    Mr. Leonard falls in this scheme.  I can certainly see the

7    Court going to the lower end of the guidelines, given

8    Mr. Leonard's age and health, but we ask for a guideline

9    sentence.

10          THE COURT:  All right.  Thank you.

11          Well, let me begin by saying that the Court has

12   discretion within the range of what has been agreed to by the

13   Government.  When the Court accepts a Plea Agreement that

14   provides a cap, then the Court cannot exceed the cap.  This

15   was -- would have been a 20-year case under the guidelines and

16   now the maximum is 10.  So when the Court responds to an

17   argument that the 5K motion is a little penurious -- that is

18   the way I took your argument -- I hear you.  I'm taking your

19   argument at face value, but this case started as a 20 and,

20   through a decision of the Government, it became a 10.  So the

21   Defendant has received a substantial benefit already which,

22   although it doesn't preclude an additional motion for

23   cooperation, the Government, in fact, has filed it.  The Court

24   made note of it when accepting these pleas in the first place

25   that there was a substantial reduction, and I'm paying

60

1  attention to that because the guidelines in this case would

2  have been substantially higher.

3         I want to make a couple of observations, some of

4  which Mr. Wirmani made and some he did not.

5         I'm going to begin with Mr. Leonard's upbringing.

6  It's fair to say, as you did, Mr. Lewis, that Mr. Leonard had

7  a very difficult upbringing, a very difficult situation with

8  his father.  Thank the good Lord for his stepmother.  His

9  father was a recurring figure in his life for a long time;

10  took him out of a stable situation, kept coming back like a

11  bad penny or worse, and then died.  Mr. Leonard overcame that

12  very difficult beginning and for that, he deserves credit.

13         He took the tragedy involving the loss of his son and

14  turned it into a business that had the potential to make a

15  good living for him and his family and to save children from

16  injury at the same time, and that's another thing that he did

17  in his life that showed a tenacity and a strength that are

18  commendable.

19         But then here we are, a person with those strengths,

20  with some fundamental precepts that he passed on presumably to

21  both of his children, which his daughter Nicole has

22  articulated today, and then for whatever reason there might

23  be, turned his back on all of that.

24         This is a shameful story, and I will say what I had

25  said before, some of which gets reported and some of which

```
 1    doesn't.  The Court takes the cases as the Court finds them.

 2    When I have a person who's charged with tax evasion, I

 3    sentence them for tax evasion.  This is not a tax evasion

 4    case.  This is a bribery case on a services fraud where

 5    Mr. Leonard indisputably paid a substantial amount of bribes

 6    to Mr. Sorrells and Mr. Caraway for his own business purposes.

 7    And whether this was a good idea or not a good idea, it

 8    started the ball rolling down the hill and now the whole

 9    enterprise is a disaster.  It's over and done to the great

10    loss of the taxpayers, the community and countless employees

11    of Dallas County Schools, and Mr. Leonard is right smack in

12    the middle of it.  Why he felt the need to do it, I don't

13    know.

14          This notion that Mr. Sorrells was his brother, he's

15    his brother in crime.  If he thinks of him as his brother

16    beyond that, I don't understand that kind of relationship with

17    a sibling that would turn a person, who led an honest,

18    law-abiding life, overcame some substantial hurdles and

19    deserves commendation for that, and then sank to the very

20    depths of becoming a person that turned his back on all of

21    that to the great loss of our community and his own family.

22          If you ask me if I feel sorry for Linda, your ex-wife

23    with whom you live and who has supported you in countless

24    ways, particularly in your health and you -- her -- and soon

25    that will come to a horrible end because you will not be there
```

```
 1    for her and she will not be there for you, and that is the
 2    result of your very poor choices.
 3         The problem is that people who did not make these bad
 4    choices pay the price, and that is every day that I sit up
 5    here and send people to prison because their families are
 6    victims, too.  And that is, oh, so sad, and I don't mean that
 7    in a cheap way; I mean that in a most sincere way.  Family
 8    members who hold their family members to the highest standard
 9    when they are disappointed, it's more than disappointment; it
10    is a fundamental change in the rest of their lives.  And the
11    only way I can sleep at night is to know that I am not the
12    cause of that having happened.
13         So, Mr. Leonard, I give you credit where credit is
14    due.  You had a good idea, but the execution and what happened
15    afterwards makes that good idea pale by comparison.  This is a
16    shameful episode in our community.  To the extent there were
17    good investigators in the public who discovered this scheme,
18    then kudos to them and to the investigators who found it, but
19    we can't put Humpty-Dumpty back together again.  The
20    enterprise is over and done.  To the extent that was a good
21    idea, it will not, at least in the short run, come to fruition
22    at all.  And whether the Dallas County Schools bore some
23    responsibility in the execution of this program doesn't matter
24    today.  What we're about is what was a fraudulent scheme to
25    pay off public officials.  And I will echo what Mr. Wirmani
```

63

1    said.  It just doesn't meet the "smell" test to say, "I

2    thought everything was okay," when these payments are going

3    through this convoluted course through made-up companies and

4    false consulting agreements and the like to conceal what was

5    actually being done.  And as the investigation got closer and

6    closer, the cover-up got worse and worse.  And I can't look at

7    all of that -- and I have looked at all of that -- and

8    conclude that this was just some, "Well, wink and nod; maybe

9    this isn't completely correct, but it's certainly not

10    illegal."  That is completely inconsistent with the way that

11    those involved in this scheme treated it.

12        In terms of what the Government has told me about

13    your assistance, I'm giving the credit that the Government

14    recommended, and I think that the extent to which the

15    Government reduced your exposure in the first place

16    appropriately rewards the rest of it.

17        So the Court, in determining the appropriate

18    sentence, is to consider all the factors under 18

19    United States Code section 3553(a) in determining what is an

20    appropriate sentence.

21        I begin with the nature and circumstances of the

22    offense; very serious.  You do not have a criminal history but

23    in one sense, your turning to this, when you didn't, makes it

24    even worse because you knew what right conduct was and you

25    engaged in wrong conduct.

1          Next, the need for the sentence imposed to reflect

2     the seriousness of the offense and to promote respect for the

3     law and to justly punish you, in the Court's views that's most

4     of what this case was about.  This is an extremely serious

5     offense.  The public needs to know that the law does not abide

6     this kind of conduct, and the Court needs to fashion a just

7     punishment.

8          Next, to deter criminal conduct by others.  That also

9     is a significant factor that the Court is considering.

10         In terms of protection of the public from you, I

11    don't think that is a significant factor, given your age and

12    your health.  So that is not a significant factor in the

13    Court's determination.

14         Next, protecting -- excuse me -- providing you with

15    needed educational or vocational training or medical care.

16    Obviously, you have a host of very serious medical conditions.

17    In the 19 years I have been doing this job, Mr. Leonard, the

18    age of defendants I have seen has gotten older and older, and

19    the Bureau of Prisons, unfortunately, has had to have a lot of

20    schooling on how to deal with older inmates because they have

21    a lot of older inmates.  I've -- I had people who have gone to

22    prison who need dialysis and the like.  Unfortunately, they've

23    had to learn how to deal with health conditions that are

24    similar to yours.

25         It's just not going to be the case, Mr. Leonard; in

1    case you have been thinking that I'm going to send you home to

2    Linda's good care, I'm not.  This case deserves a serious term

3    of imprisonment, and that is what I'm going to impose.

4          Considering all of the factors that the Court has

5    enumerated and in light of the testimony that the Court has

6    heard, the Court's determination is that an appropriate

7    sentence and the sentence the Court imposes is 84 months in

8    custody.

9          You have requested that the Court defer your

10   reporting date until July the 19th.  Is there any objection to

11   that?

12         MR. WIRMANI:  I have no objection, Your Honor.

13         THE COURT:  All right.  The Court will -- Is that --

14   What day is that, Amanda?

15         COURTROOM DEPUTY:  It's a Friday.

16         THE COURT:  I'll do it to the following Tuesday which

17   is the 23rd?

18         COURTROOM DEPUTY:  Yes.

19         THE COURT:  All right.  I'll make it July the 23rd,

20   the preferred date for reporting.  It's a Tuesday.  So it will

21   be July the 23rd.

22         Now, Mr. Leonard, I'm going to come back to this

23   later, but you do not have a right for me not to take you into

24   custody today.  That is a privilege that I'm extending to you.

25         I am confident that you will abide by all local,

1   state and federal laws and ordinances and that you will comply

2   with all requests of the Probation Office.  You are required,

3   before you leave today, to go up to the Marshals Office to be

4   processed.  If you violate the law in any way between now and

5   July the 23rd, 2019, that will come to my attention, and I

6   will take you into custody immediately.  Do you understand

7   that?

8           THE DEFENDANT:  Yes, ma'am.

9           THE COURT:  All right.  The Court has determined that

10  you are required to make mandatory victims restitution

11  according to the Mandatory Victim Restitution Act of 1996 in

12  the amount of 125 million dollars, to be paid -- That is not

13  jointly and severally with Mr. Caraway in that amount, is it?

14          MR. WIRMANI:  I believe it should be jointly and

15  severally with Mr. Sorrells.

16          THE COURT:  I do have Mr. Sorrells, but -- excuse me

17  -- I don't remember the amount as to which that would be joint

18  and several with Mr. Caraway.  I will provide for that in the

19  judgment.  That will be jointly and severally with

20  Mr. Sorrells, but that is subject to Mr. Sorrells being able

21  to object to the amount, if he wishes to do so.  This cannot

22  be binding on him since he's not here.  I don't remember the

23  restitution amount for Mr. Caraway, but the judgment will

24  reflect that whatever the restitution amount I provided for

25  him will be jointly and severally with you, Mr. Leonard.

```
 1          That will be made payable to the United States

 2   District Clerk at 1100 Commerce Street, Room 1452, Dallas,

 3   Texas 75242.  Restitution will be payable immediately with any

 4   unpaid balance payable during incarceration.  Restitution will

 5   be dispersed to the Dissolution Committee for the Former Board

 6   of Trustees of the Dallas County Schools in the amount of 125

 7   million dollars.  The reference will be:  Robert Carl Leonard,

 8   Jr.

 9          If upon commencement of the term of supervised

10   release any part of the restitution remains unpaid, which it

11   certainly will be, Mr. Leonard is required to make payments on

12   the unpaid balance in monthly installments of not less than

13   ten percent of his gross monthly income or at a rate of not

14   less than $50 per month, whichever is greater.  Payment will

15   begin no later than 60 days after your release from

16   confinement and will continue each month thereafter until the

17   balance is paid in full.  In addition, at least 50 percent of

18   any receipts from gifts, tax returns, inheritances, bonuses,

19   lawsuit awards and any other similar received money will be

20   paid toward the unpaid balance within 15 days of receipt.

21   This payment plan will not affect the ability of the

22   Government to immediately collect payment in full through

23   garnishment, the treasury offset program, the inmate financial

24   responsibility program, the Federal Debt Collection Procedures

25   Act of 1990, or any other means available under federal or
```

1    state law.  The Court further orders that interest on the

2    unpaid balance will be waived pursuant to 18 United States

3    Code Section 3612(f)(3).

4         I believe I stated it, but in case I did not, the

5    Offense Level is 30.  The Defendant's Criminal History

6    Category is I, and that is before the reduction pursuant to

7    the Government's motion.

8         I will not require you to pay a fine, Mr. Leonard,

9    because I do not believe you have the financial capacity to do

10   so in light of the restitution obligation.  You are, however,

11   to -- required to make a mandatory special assessment of $100.

12        Pursuant to the Preliminary Order of Forfeiture that

13   the Court issued on August 27th, 2018, the Court orders final

14   forfeiture of the following items and property.

15        Do the parties agree that the Court can just describe

16   these properties in summary fashion?

17        MR. LEWIS:  Yes, Your Honor.

18        MR. WIRMANI:  Yes, Your Honor.

19        THE COURT:  All right.  2008 Bentley Continental GT;

20   2013 Jeep Grand Cherokee; $109.39 in currency from an account

21   ending 0851; $29,449.64 in United States currency from an

22   account ending in 3128; $150,770.90 in United States currency

23   from an account ending in 9508; $557,273.60 in United States

24   currency from an account ending in 2057; $564 in United States

25   currency from an account ending in 8321; collection of seven

69

1    paintings by Artist David Harouni; assorted jewelry seized on

2    June 15th, 2017:  Six rings and one necklace.

3          When the Defendant is released from imprisonment, he

4    will be on supervised release for a term of three years.

5          When he is released from imprisonment, he will comply

6    with the standard conditions contained in the Court's judgment

7    and with these mandatory and special conditions.

8          Mr. Leonard, you will not commit another federal,

9    state or local crime.

10         You will not unlawfully possess a controlled

11   substance.

12         You will cooperate in the collection of DNA as

13   directed by the probation officer.

14         The Court will suspend the mandatory drug testing

15   condition based on my determination that you pose a low risk

16   of future substance abuse.

17         You will pay any remaining balance of restitution.

18         You will refrain from incurring new credit charges or

19   opening additional lines of credit without the approval of

20   your probation officer, unless the officer determines that you

21   are in compliance with your obligation to pay the restitution

22   amount in full, and you will provide to the probation officer

23   any requested financial information.

24         Now, Mr. Leonard, I want to speak to you for a moment

25   about the Court allowing you approximately two months to

1   report.  The Court wants your assurances that you are not

2   feeling in a situation of stress or depression, such that I

3   need to be concerned about any threats to your safety or the

4   safety of others.  Are you feeling mentally depressed to the

5   extent that you consider yourself to be a danger to yourself?

6           THE DEFENDANT:  No, ma'am.  I would never do that.

7   That's not my option.  It's the Lord's option.

8           THE COURT:  All right.  And I understand that you had

9   some firearms but they are being kept for you by a friend.  Is

10  that correct?

11          THE DEFENDANT:  I signed them over.

12          THE COURT:  Okay.

13          THE DEFENDANT:  I sent the letter and -- I sent it

14  over to Probation.

15          THE COURT:  All right.  Will you commit to me,

16  Mr. Leonard, that to the extent that during this next

17  two-month period you feel that your mental state is such that

18  you need assistance, that you will report that to the

19  probation officer and will seek help from a mental health

20  professional?

21          THE DEFENDANT:  Yes.

22          THE COURT:  All right.  Then the Court will, as I

23  stated, defer the reporting date until July the 23rd, 2019.

24          Are there any other issues that either the Government

25  or the Defense wish the Court to address in the Court's

 1    judgment?

 2          MR. LEWIS:  Your Honor, the only other thing is we

 3    would like the Court to make a recommendation as far as

 4    housing in Pensacola.

 5          THE COURT:  I'm not going to do that, not because I

 6    don't want him to go to Pensacola, but I'm now qualified in

 7    light of the serious and varied types of physical issues that

 8    the Defendant has to determine if that's the right place for

 9    him.  I will note that the Defendant has requested Pensacola,

10    and if that is a place that can satisfy his physical needs,

11    the Court has no objection to that.

12          THE DEFENDANT:  It's just close.

13          THE COURT:  Okay.  I understand that, but they may --

14    I don't know whether there are beds there, and I don't know if

15    that's the place for someone with your health conditions.  If

16    the Bureau of Prisons would otherwise put you there, I have no

17    problem.  Is that the closest to your family?

18          THE DEFENDANT:  Yeah, it's close to where we live.

19          THE COURT:  Okay.

20          THE DEFENDANT:  It's four hours.

21          THE COURT:  All right.  I'll so note that.

22          All right.  Any other issues?

23          MR. LEWIS:  No, Your Honor.

24          THE COURT:  Do you know of any reason why the Court

25    cannot lawfully impose the sentence as stated?

1          MR. LEWIS:  I do not, Your Honor.

2          THE COURT:  All right.  Then the Court does impose

3   the sentence as stated.  Copies of the Presentence Report will

4   be furnished to the Bureau of Prisons and the Sentencing

5   Commission.

6          To the extent you have not waived or limited your

7   right to appeal, Mr. Leonard, if you wish to do so, you must

8   do to within 14 days of the date of the judgment.  If you

9   cannot afford counsel for any appeal, you need to demonstrate

10  that to the satisfaction of the Court.  And if the Court is

11  persuaded to that, then the Court will appoint counsel for

12  you.  I do require that you go up to -- talk to Probation and

13  make arrangements to be processed.

14         All right.  If there's nothing further, then we'll

15  take a five-minute recess.  Thank you.

16         Okay.  All right.  I understand you're to go to the

17  Marshals Office, not the Probation Office.  Okay?

18         MR. LEWIS:  Yes, Your Honor.

19         THE COURT:  All right.  Thank you.  All right.  Take

20  a five-minute recess.

21         COURT SECURITY OFFICER:  All rise.

22         (Hearing adjourned at 3:55 PM.)

23

24

25

CERTIFICATE OF OFFICIAL REPORTER


        I, Deborah A. Kriegshauser, Federal Official Realtime

Court Reporter, in and for the United States District Court

for the Eastern District of Missouri, do hereby certify that

pursuant to Section 753, Title 28, United States Code, that

the foregoing is a true and correct transcript of the

stenographically-reported proceedings held in the

above-entitled matter and that the transcript page format is

in conformance with the regulations of the Judicial Conference

of the United States.

        Dated this 21st day of May, 2019.


                        /s/ Deborah A. Kriegshauser
                        _____
                        DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
                        FEDERAL OFFICIAL COURT REPORTER